Robert T. Ely and Jeanne M. Ely v. Commissioner.
Ely v. Commissioner
Docket No. 60483.
United States Tax Court
T.C. Memo 1958-86; 1958 Tax Ct. Memo LEXIS 146; 17 T.C.M. (CCH) 422; T.C.M. (RIA) 58086; May 13, 1958
William Braham Washabaugh, Jr., Esq., and Enoch C. Filer, Esq., Ariel Building, Erie, Pa., for the petitioners. Donald W. Howser, Esq., for the respondent. TIETJENS
Memorandum Findings of Fact and Opinion TIETJENS, Judge: The Commissioner determined a deficiency in income tax of $8,057.74 and additions to tax of $717.23 under section 294(d)(1)(A) and $478.16 under section 294(d)(2) for the year 1950. The questions for decision are (1) whether a deduction of $36,945.36 was properly claimed as a partially worthless business bad debt under section 23(k)(1) of the Internal Revenue Code of 1939, and (2) the propriety of the determination of additions to tax for failure to file a timely estimate of tax and for substantial underestimation of estimated tax. Findings of Fact Some of the facts are stipulated, are *147 so found, and the stipulation of facts together with the pertinent exhibits are included herein by this reference. Robert T. Ely (hereinafter called petitioner) and Jeanne M. Ely, are husband and wife. They filed a joint income tax return for 1950 with the collector of internal revenue for the 23rd district of Pennsylvania, at Pittsburgh, Pennsylvania. Petitioner was honorably discharged as a Captain in the Armed Services of the United States in January of 1946 and had inherited a substantial amount of money from his grandfather who died in 1945. On his discharge, petitioner began to look for investment opportunities for his funds. On the tax returns for 1948 and 1949, petitioner described his occupation as "Executive". On the 1950 return, he described his occupation as "Business venture". Acorn Plastic Engineers, Inc., hereinafter referred to as Acorn, is a corporation organized on March 14, 1946, under and by virtue of the laws of the Commonwealth of Pennsylvania, with an authorized capital of $75,000 divided into 750 shares of common stock having par value of $100 each. The Articles of Incorporation of Acorn state that it was incorporated for the purpose or purposes: to *148 design, develop, manufacture and sell at wholesale and retail, plastics, electrical and mechanical equipment and products, to render engineering services, and to purchase, lease, and acquire such real estate as is necessary and convenient for the operation of said business and to mortgage and convey title to the same. Shortly after its incorporation, 150 shares of capital stock of the par value of $15,000 were issued to petitioner, 20 shares of the par value of $2,000 were issued to his uncle, F. W. Ely, whom petitioner hoped would manage the business, and 2 shares of the par value of $200 were issued to George P. Marshall. After Acorn was organized, petitioner's uncle lost interest in the venture and declined to put in further money. He withdrew in August 1946 and petitioner purchased the 20 shares of stock held by him. Subsequent to such time and prior to May 8, 1947, Acorn issued to petitioner 450 additional shares of the par value of $45,000. In 1949 petitioner purchased from George P. Marshall the remaining 2 shares of stock outstanding, making his total holdings of Acorn 622 shares with an aggregate par value of $62,200. He retained ownership of said stock at all times subsequent *149 to his aquisition thereof and no other person acquired ownership of Acorn stock. Petitioner was elected treasurer on organization of Acorn and upon purchase of his uncle's stock he was elected president, remaining president and treasurer at all subsequent times pertinent to this case. On various dates during the period from August 31, 1946, to March 31, 1952, petitioner purchased and paid for machinery for Acorn, paid various expenses of Acorn, and paid to Acorn various sums of money, and on various dates during such period Acorn paid to and on behalf of petitioner various amounts of money. Such payments were entered on the books of Acorn by a system of debits and credits on a running account nominated "Advances from Officer" and "Amounts Due Officer". Petitioner first began to make the advances to Acorn after his uncle's withdrawal, and at a time when only $17,200 had been paid in to capital. He continued to make the advances from time to time as Acorn needed money to buy equipment, to pay expenses, and "to fulfill some obligations we got into several times as a result of anticipated new business or new personnel". No interest was charged on the advances and the money so advanced *150 was to be repaid "as the corporation was in a position to do so". The advances were reflected on Acorn's balance sheets for the years 1947, 1948, and 1949 under "Long Term Liabilities". By March 31, 1947, petitioner had been credited on such account with the total sum of $76,933.33 for payments made to or on behalf of Acorn, with a debit of $114.40 made to the account, leaving a balance in petitioner's favor of $76,788.93. On such date, the account was debited "to transfer to Capital Stock (R.T.E.) 18,500.00" and "To transfer R.T.E. monies to Notes Payable Account, 50,000.00", leaving a balance of $8,288.93 credited to petitioner. Payment for the balance of the $62,200 of capital stock issued to petitioner was made by him directly to the corporation. On March 31, 1947, Acorn executed and delivered to petitioner a promissory note in the sum of $50,000 payable on demand without interest. The note was executed on behalf of Acorn by petitioner as president. Entry of said note was made on the books of Acorn on a notes payable account. On March 31, 1948, the notes payable account of Acorn was debited by the amount $34,019.99 for the net book value of assets transferred to petitioner *151 to apply on the $50,000 note. The note payable account bears the notation that the balance of $15,980.01 was written off on March 31, 1952. Acorn sustained net losses from its operation for the fiscal years ended March 31, 1947
in the total amount of $30,187.14
March 31, 1948
in the total amount of
26,192.34
March 31, 1949
in the total amount of
11,730.93
March 31, 1950
in the total amount of
10,973.64
March 31, 1951
in the total amount of
25,424.98
March 31, 1952
in the total amount of
31,369.53 as reflected on its income tax returns duly filed. For the nine months period ended December 31, 1950, Acorn sustained a net operating loss of $7,212.54. Petitioner transferred machinery which he had received with other assets from Acorn to Perry Plastics Corporation in exchange for $30,000 capital stock, a minority interest. Acorn ceased manufacturing operations and thereafter operated largely as a sales agency of plastic tile manufactured by Perry Plastics. Petitioner became vice president and a director of Perry Plastics and continued as such until 1949 or 1950 when he withdrew from participation in that concern. The record does not show who organized *152 Perry Plastics. In 1949 petitioners formed a partnership named Ely Enterprises to operate as a sales agency and supply, on petitioner's personal credit, the customers whom Acorn did not have sufficient credit to supply, and for the further purpose of separating that type of operation from Acorn's sales through commission agents. Acorn's balance sheet dated December 31, 1950, reflects assets totaling $60,192.08, including an item nominated "Deferred Motion Advertising Costs and Income" in the amount of $13,643.87. The liabilities aggregated $83,493.57, which included a balance of $55,822.19 shown on the "Amount Due Officer" account at such date, the $15,980.01 balance of the $50,000 note payable to petitioner, and $11,691.37 owing to others, giving a minus net worth of $23,301.49. Between the dates of March 31, 1949, and December 31, 1950, during which time Acorn was insolvent, petitioner made net advances to Acorn to increase the "Advances from Officer" account by about $40,000. During the last nine months of the calendar year 1950, the "Amount Due Officer" account was increased by about $15,000. The total advances during the year 1950 amounted to $38,899.50. During the last *153 nine months of the calendar year 1951, the account was increased by $3,000. Subsequent to December 31, 1950, Acorn continued to do business and expended a substantial sum of money for merchandise to be sold. Acorn ceased doing business in the spring of 1952. Aside from his interest in Ely Enterprises, Acorn, and Perry Plastics, petitioner was a licensed real estate and insurance salesman and invested $30,000 with members of a real estate firm in connection with building 12 houses; purchased a building and dwelling in 1946, renting part of the building to Acorn and the dwelling to third parties; purchased 3 multiple tenancy properties in 1952; erected an apartment house in 1953, and purchased houses in 1950 and 1955 in Florida. He loaned $1,500 to a Club Carr and $3,000 and $6,000 to Gordon Lindsey, a close personal friend, all without taking notes. He loaned $1,900 to Byron Mac-Intosh, an employee of Acorn, to buy a house, and $5,000 to LaMarque Restaurant, taking non-interest bearing notes in each instance. He sold 2 lots to Albert Pope, taking a $2,200 non-interest bearing and unsecured note for part of the purchase price. Ely Enterprises sold $58,000 of plastic products to Penny-King *154 and $680 of plastic products to a City Club, both on open account. Acorn sold $13,000 of products to Styron-BriTile on open account. Petitioner personally sold $2,600 of molds and products to Universal Marc-A-Plot on open account, and personally endorsed several of Acorn's bank loans and guaranteed Perry Plastic's credit to the extent of $13,000. The amount of $36,945.36 was deducted on petitioners' joint income tax return for the calendar year 1950, with the explanation that it constituted the portion of a bad debt, owing to petitioner Robert T. Ely by Acorn Plastic Engineers, Inc., which became worthless in 1950. In the statutory notice of deficiency mailed by respondent to petitioners, it was determined by respondent that such deduction was not allowable. Petitioner's income tax returns for 1949 and 1950 disclosed no taxable income. In 1949 petitioner reported income from a trust in the amount of $9,314.41. In 1950 he reported income from the same trust in the amount of $7,824.88. A certified public accountant prepared petitioner's income tax returns as well as those of Acorn. Petitioner relied on the accountant's advice in tax matters during the taxable year. Petitioners *155 did not file any declaration of estimated tax for the calendar year 1950. Opinion The Commissioner's contentions in support of disallowing the deduction claimed for partial worthlessness of the debt may be summarized as follows: first, the advances constituted contributions to capital and not indebtedness; second, if a debt existed it was a non-business debt and no deduction for partial worthlessness can be claimed under the statute; and, third, that petitioner has not proved worthlessness in 1950. Petitioner, on the other hand, makes one primary contention, i.e. that he was in the trade or business of engaging in business ventures and that the indebtedness of Acorn to him was proximately related to his activities in "promoting, organizing, financing and loaning funds to customers of enterprises and businesses in the management and business of which (he took) an active part and (devoted) a substantial part of his time and energy." The burden of proving the propriety of the claimed deduction is on petitioner. He relies on Foss v. Commissioner, 75 Fed. (2d) 326 (C.A. 1), (reversing a Memorandum Opinion of this Court, Commissioner v. Stokes' Estate, 200 Fed. (2d) 637 *156 (C.A. 3), (affirming a Memorandum Opinion of this Court [10 TCM 1111]), Tony Martin, 25 T.C. 94, Vincent C. Giblin v. Commissioner, 227 Fed. (2d) 692 (C.A. 5), (reversing a Memorandum Opinion of this Court [13 TCM 1009; T.C. Memo. 1954-186]) and several Memorandum Opinions of this Court. It is recognized that whether the activities of a taxpayer add up to engaging in a trade or business is largely a question of fact and "requires an examination of the facts in each case." Higgins v. Commissioner, 312 U.S. 212. Here petitioner had participated in the organization of but a single corporation - Acorn, to which the advances in question were made. He later became an officer in another - Perry Plastics - for which he guaranteed credit to the extent of $13,000. He was a member of a partnership operating as a sales agency for some customers whom Acorn did not have sufficient credit to supply. He supplied his personal credit to the partnership. In addition, he was a real estate broker, entered into a few transactions involving real estate and made the few loans otherwise detailed in our findings of fact. None *157 of the loans carried interest and petitioner does not claim to have been in the business of lending money or of financing corporations. On the facts we hold that the advances made to Acorn, even if they were loans rather than contributions to capital, were not business debts. We are of the opinion that the activities of petitioner were not extensive enough to bring his case within the ambit of the cases on which he relies. See Higgins v. Commissioner, supra, A. Kingsley Ferguson, 16 T.C. 1248, Fred A. Bihlmaier, 17 T.C. 620, and Estate of William P. Palmer, Jr., 17 T.C. 702. Even if we are in error in so holding, petitioner must lose on another ground. He has not proven that the debt became worthless to the extent claimed in the year 1950. The findings of fact show that in each year beginning with the fiscal year ending March 31, 1947 through the fiscal year ending March 31, 1952, Acorn operated at a loss. Nevertheless, petitioner continued to advance moneys, and part of the advances were made when Acorn was insolvent. Even during the year 1950, the year in which the worthlessness is claimed, total advances were $38,899.50, more *158 than the claimed deduction. The claim of worthlessness in that year, despite the attempted explanation that the Korean War was curtailing operations, is certainly inconsistent with the advances made, Janet McBride, 23 T.C. 926. We find no identifiable event in 1950 which would justify petitioner in claiming the worthlessness of a substantial portion of his indebtedness in that year. As a matter of fact, the stipulated "Advances from Officer" account shows that during 1950 petitioner was debited in this account for amounts totaling around $42,000. We find no justification for allowing the claimed deduction in 1950 and sustain the Commissioner's determination in this respect. It thus becomes unnecessary for us to decide whether or not the advances constituted an indebtedness or contributions to capital. With reference to the additions to tax for failure to file a timely estimate and for substantial underestimate, petitioner contends that the failure to file was due to reasonable cause, in that the advice of a certified public accountant was relied on, and that no additional penalty for substantial understimation can properly be determined in any event. We have found *159 as a fact that petitioner relied on the advice of a certified public accountant in not filing an estimate of tax. But this is not sufficient to show that the failure to file was "due to reasonable cause and not to willful neglect." Rene R. Bouche, 18 T.C. 144, John T. Potter, 27 T.C. 200. Furthermore, there is no evidence in the record to show that the accountant was a competent tax advisor. The accountant himself testified that he was aware petitioner would receive between $7,000 to $10,000 from an estate and that, "if it is a reason," he advised no estimate need be filed for 1950 because petitioner's 1949 return showed no taxable income. It may be pointed out that the statute requires the filing of a return of estimated tax if the taxpayer's gross income from sources other than wages can reasonably be expected to exceed $100 for the taxable year and his gross income to be $600 or more. Sec. 58, Internal Revenue Code of 1939, as amended. As said in Marvin Maxey, 26 T.C. 992, 996, "the expectation of little or no net taxable income does not excuse a taxpayer's failure to file a declaration where the amount of his gross income satisfies the statutory *160 requirements for filing." We hold that petitioner has not shown that his failure to file a return of estimated tax was due to reasonable cause and not to willful neglect. On this record the determination of an addition to tax for substantial underestimation must also be held to be proper. Since the petitioners failed to file a declaration of estimated tax, their estimated tax was zero. G. E. Fuller, 20 T.C. 308, affd. 213 Fed. (2d) 102. The statute contains no provision for excusing substantial underestimation for "reasonable cause" and petitioners cannot escape the addition to tax on that ground. Harry Hartley, 23 T.C. 353. Decision will be entered for the respondent.